**NORTH AMERICAN SOCCER LEAGUE;** Orange County Pro Soccer; Chicago World Soccer Inc.; Caribous of Colorado, Inc.; Michigan Soccer, Limited; Houston Professional Soccer Club, Ltd.; Aztec Professional Soccer Club; Memphis Soccer Club, Inc.; Minnesota Soccer, Inc.; Lipton Professional Soccer, Inc.; Cosmos Soccer Club, Inc.; Oakland Stompers, Ltd.; Philadelphia Soccer Associates; Oregon Soccer, Inc.; Blue & Gold, Ltd.; San Diego Professional Soccer Club; San Jose Earthquakes, Limited; Tampa Bay Soccer Club, Inc.; Pro Soccer, Ltd.; Tulsa Roughnecks, Ltd.; Vancouver Professional Soccer Club, Ltd.; and Washington Diplomats Soccer Club, Inc., Plaintiffs,

v.

**NATIONAL FOOTBALL LEAGUE;** San Francisco 49ers; Oakland Raiders; New England Patriots Football Club, Inc.; Minnesota Vikings Football Club, Inc.; The Five Smiths, Inc.; Baltimore Football, Inc.; Highwood Service, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; Dallas Cowboys Football Club, Inc.; Empire Sports, Inc., The Detroit Lions, Inc.; Greenbay Packers, Inc.; Houston Oilers, Inc.; Los Angeles Rams Football Co.; New Orleans Saints; New York Football Giants, Inc.; New York Jets Football Club, Inc.; Leonard H. Tose, d/b/a Philadelphia Eagles Football Club; Pittsburgh Steelers Sports; Chargers Football Company; Chicago Cardinals Football Club; Pro-Football, Inc.; and Tampa Bay Buccaneers, Inc., Defendants.

No. 78 Civ. 4560–CSH.

United States District Court,
S. D. New York.

Nov. 17, 1980.

Weil, Gotshal & Manges, New York City, for plaintiffs; Ira M. Millstein, James W. Quinn, Irwin H. Warren, Jeffrey L. Kessler, Kenneth L. Steinthal, New York City, of counsel.

Sullivan & Cromwell, New York City, for The National Football League and Certain NFL Teams; William E. Willis, James H. Carter, Jr., Howard D. Burnett, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

### INTRODUCTION

This is a private antitrust suit, tried to the Court without a jury. Plaintiff North American Soccer League (the "NASL") is an unincorporated association of 24 professional soccer clubs located throughout the United States and Canada. The other plaintiffs are 21 of those 24 member organizations. Defendant National Football League (the "NFL") is an unincorporated association of 28 professional football clubs located throughout the United States. The other defendants are 25 of those 28 member organizations.

In October, 1978, the NFL scheduled a meeting to vote upon a proposed amendment to its by-laws which reads as follows:

"Amend Article IX, by adding a new Section 9.4 as follows:

"9.4(A) No person (1) owning a majority interest in a member club, or (2) directly or indirectly having substantial operational control, or substantial influence over the operations, of a member club, or (3) serving as an officer or director of a member club, nor (4) any spouse or minor child of any such person, may directly or indirectly acquire, retain, or possess any interest in another major team sport (including major league baseball, basketball, hockey and soccer).

"(B) The prohibition set forth in subsection (A) hereof shall also apply to relatives of such persons (including siblings, parents, adult children, adult and minor grand children, nephews and nieces, and relatives by marriage) (1) if such person directly or indirectly provided or contributed all or any part of the funds used to purchase or operate the other sports league entity, or (2) if there exists between such person and any such relative a significant community of interest in the successful operation of the other sports league entity.

"(C) The Commissioner shall investigate, to the extent he deems necessary or appropriate, any reported or apparent viola-

tion of this Section and shall report his findings to the Executive Committee prior to imposition of disciplinary action by the Committee.

"(D) Beginning on February 1, 1980, any person who, after notice and hearing by the Executive Committee, is found to have violated subsection (A) or (B) above will be subject to fines of up to $25,000 per month for each of the first three months of violations; up to $50,000 per month for each of the next three months; and up to $75,000 per month thereafter. In addition, violations of more than six months' duration may be dealt with by the Executive Committee pursuant to Article VIII, Section 8.13(B).

"(E) If such person does not pay such fine to the League Treasurer within 20 days of its assessment, the unpaid amount thereof may be withheld, in whole or in part, by the Commissioner from available funds in possession of the League Office belonging to the member club with which the person in violation is affiliated."

This proposed by-law will hereafter be referred to as the "cross-ownership ban."

Plaintiffs allege that the cross-ownership ban, if enacted by defendants, would violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Their complaint, invoking Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, sought to preliminarily and permanently enjoin implementation of the by-law. Plaintiffs also prayed for a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring the proposed cross-ownership ban, together with other actual and threatened conduct by defendants, violative of the Sherman Act, and for treble damages. Jurisdiction lay under 28 U.S.C. §§ 1331 and 1337, and venue under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15 and 22.

Defendants denied the allegations of the complaint, and asserted two counterclaims against plaintiffs, alleging Sherman Act violations on their part.

At the outset I granted plaintiffs a preliminary injunction, restraining defendants from enacting the proposed by-law or otherwise implementing the cross-ownership ban.

465 F.Supp. 665. The case then proceeded through discovery, preparation of a joint pre-trial order, and trial. I wish particularly to compliment counsel for both sides for meticulous preparation and able advocacy.

I now enter the following Findings of Fact, Discussion, and Conclusions of Law. Rule 52(a), F.R.Civ.P.

## FINDINGS OF FACT

These findings adopt, in substantial measure, the helpful statement of agreed facts prepared by the parties in connection with the pre-trial order.

### I. *THE PARTIES*

*No. 1*: Plaintiff North American Soccer League (the "NASL") is an unincorporated association of twenty-four (24) professional soccer clubs located throughout the United States and Canada.

*No. 2*: The NASL was organized in 1968 upon the merger of two predecessor soccer leagues for the purpose of promoting major league professional soccer in North America and is engaged in interstate commerce in the business of operating a professional soccer league.

*No. 3*: The other plaintiffs (or their successors) are 21 of the NASL member organizations (each of which is a corporation except where noted) which, at the time suit was filed, owned and operated professional soccer clubs for profit under the names and in the cities set forth below:

| Plaintiff Team Owner | State or Province of Organization or Incorporation | Club Name (City) |
| --- | --- | --- |
| Orange County Pro Soccer (limited partnership) | California, U.S.A. | California Surf (Anaheim) |
| Chicago-World Soccer, Inc. | Illinois, U.S.A. | Chicago Sting |
| Atlanta Professional Soccer, Ltd. (limited partnership) | Georgia, U.S.A. | Atlanta Chiefs |
| Michigan Soccer Limited (limited partnership) | Michigan, U.S.A. | Detroit Express |
| Houston Professional Soccer Club, Inc. | Texas, U.S.A. | Houston Hurricane |
| Aztecs Professional Soccer Club (limited partnership) | California, U.S.A. | Los Angeles Aztecs |

clubs for profit under the club names and in the cities set forth below:

| Plaintiff Team Owner | State or Province of Organization or Incorporation | Club Name (City) |
|---|---|---|
| Memphis Rogues, Ltd. (limited partnership) | Tennessee, U.S.A. | Memphis Rogues |
| Minnesota Soccer, Inc. | Minnesota, U.S.A. | Minnesota Kicks (Minneapolis) |
| Lipton Professional Soccer, Inc. | Delaware, U.S.A. | New England Tea Men (Boston) |
| Cosmos Soccer Club, Inc. | New York, U.S.A. | New York Cosmos |
| Edmonton NASL Soccer Enterprises, Ltd. (limited company) | Alberta, Canada | Edmonton Drillers |
| Philadelphia Soccer Associates (limited partnership) | Pennsylvania, U.S.A. | Philadelphia Fury |
| Louisiana-Pacific Corporation | Delaware, U.S.A. | Portland Timbers |
| Blue & Gold Limited | New York, U.S.A. | Rochester Lancers |
| San Diego Professional Soccer Club, Inc. | California, U.S.A. | San Diego Sockers |
| San Jose Earthquakes Limited (limited partnership) | California, U.S.A. | San Jose Earthquakes |
| Tampa Bay Soccer Club, Inc. | Florida, U.S.A. | Tampa Bay Rowdies |
| Prosoccer Limited (limited company) | Ontario, Canada | Toronto Blizzard |
| Tulsa Roughnecks, Ltd. (limited partnership) | Oklahoma, U.S.A. | Tulsa Roughnecks |
| Vancouver Professional Soccer Club, Ltd. (limited company) | British Columbia, Canada | Vancouver Whitecaps |
| MSG Soccer, Inc. | New York, U.S.A. | Washington Diplomats |

| Defendant Team Owner | State of Organization or Incorporation | Club Name (City) |
|---|---|---|
| The Five Smiths, Inc. | Georgia | Atlanta Falcons |
| Baltimore Football Club, Inc. | Illinois | Baltimore Colts |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Chicago Bears Football Club, Inc. | Illinois | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns, Inc. | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Inc. | Texas | Dallas Cowboys |
| Rocky Mountain Empire Sports, Inc. | Colorado | Denver Broncos |
| The Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston Oilers, Inc. | Texas | Houston Oilers |
| Los Angeles Rams Football Company | Maryland | Los Angeles Rams |
| Minnesota Vikings Football Club, Inc. | Minnesota | Minnesota Vikings (Minneapolis) |
| New England Patriots Football Club, Inc. | Massachusetts | New England Patriots (Boston) |
| New Orleans Saints Louisiana Partnership (partnership) | Louisiana | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders, Ltd. (limited partnership) | California | Oakland Raiders |
| The Philadelphia Eagles Football Club (limited partnership) | Pennsylvania | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| St. Louis Cardinals Football Co. | Missouri | St. Louis Cardinals |
| Chargers Football Company (limited partnership) | California | San Diego Chargers |
| San Francisco Forty-Niners, Ltd. (limited partnership) | California | San Francisco 49ers |
| Tampa Bay Area NFL Football, Inc. | Florida | Tampa Bay Buccaneers |
| Pro-Football, Inc. | Maryland | Washington Redskins |

The NASL and these NASL member clubs are hereinafter referred to collectively as the NASL plaintiffs (while this opinion was in preparation, the Philadelphia Fury was sold to Molson Breweries of Montreal, and the Philadelphia NASL franchise transferred to the latter city).

*No. 4:* Defendant National Football League (the "NFL") is an unincorporated association of 28 professional football teams which is engaged in interstate commerce in the business of operating a major professional football league in the United States.

*No. 5:* The other defendants are 25 of the NFL member organizations (each of which is a corporation except where noted) which own and operate professional football clubs for profit under the club names and in the cities set forth below:

The NFL and the 24 NFL member club defendants other than Pro-Football, Inc. are hereinafter referred to collectively as the "NFL defendants"; defendant Pro-Foot-

**664**

ball, Inc. is referred to as the "Redskins." St. Louis Cardinals Football Co. is a named defendant herein, but has not been served with process. (The Redskins were dismissed from the suit on plaintiffs' consent, at the conclusion of plaintiffs' case. That is because Edward Bennett Williams, the Redskins' principal owner, has consistently opposed the NFL cross-ownership ban.)

## II. *NATURE OF INTERSTATE TRADE AND COMMERCE*

*No. 6*: Both the NFL defendants' operation of and engagement in the business of major league professional football and the NASL plaintiffs' operation of and engagement in the business of major league professional soccer involve substantial volumes of interstate trade and commerce, including, *inter alia*, the following interstate activities: travel; communications, purchase and movement of equipment; broadcasts and telecasts of league games; advertisements; promotions; sales of tickets and concession items; employment of players and referees; and negotiations for all of the above.

## III. *THE CHARACTERISTICS OF PROFESSIONAL TEAM SPORTS LEAGUES*

*No. 7*: The NASL and the NFL are two of the major professional sports leagues in the United States. Each is composed of member teams located throughout the United States (and, in the case of the NASL, in parts of Canada) which compete on the playing field with each other and also operate jointly to promote attendance at and fan interest in the games which they play and to create and market professional athletic entertainment events in competition with other sports leagues (and other producers and marketers of sports and other entertainment events.)

*No. 8*: The NASL and NFL, along with the other major professional sports leagues in hockey, basketball and baseball, compete with each other in the entertainment industry.

*No. 9*: The NASL, the NFL and the other major professional sports leagues all compete in interstate commerce for fan interest, media attention, advertising revenues and network television revenues. The primary "products" sold to the public by the individual sports leagues and/or their member teams, including the NFL and NASL, are tickets for spectator viewing and the broadcast rights to games which the individual clubs play with other league members.

*No. 10*: In the case of ticket sales and sale of local radio/television broadcasting rights, this competition occurs within the metropolitan areas in which any two or more leagues have teams; in the case of network broadcasting and telecasting rights, it occurs in a market including the entire United States and some contiguous areas of Canada.

*No. 11*: The ways in which the NFL, the NASL and other professional sports leagues organize the activities to be carried out by a central league office, various committees and the member clubs individually vary from league to league. Professional team sports leagues like the NFL and NASL, as opposed to their individual member teams, are generally responsible for, *inter alia*: national promotional activities; the negotiation of network television contracts; the employment of referees; the structure and rules of competition for the sport; certain aspects of player relations; and the establishment and enforcement of rules governing league membership.

*No. 12*: The individual clubs which comprise the NASL, like those which make up the NFL, each require, *inter alia*:

(a) adequate capital investment to support operations;

(b) membership in a league in which the member teams are reasonably well matched in playing ability;

(c) the employment of a group of highly skilled players;

(d) location in a geographic area that is able to support the team by attendance at games sufficient to provide adequate revenues;

(e) the sale of radio, television and ancillary rights to the games which they play; and

(f) a share of league revenues or funds from other sources adequate to assure the ability to field a team which is reasonably well matched with others in the same league.

*No. 13*: The economic success of each franchise in a professional sports league is dependent on the quality of sports competition throughout the league and the economic strength and stability of other league members.

*No. 14*: Damage to or the loss of any professional sports league member ordinarily damages the stability, success and operations of both the league and its individual members.

## IV. *MARKETS IN WHICH PROFESSIONAL TEAM SPORTS LEAGUES COMPETE WITH EACH OTHER*

*No. 15*: As noted in Finding No. 8, *supra*, professional sports leagues compete with each other in the entertainment industry. The general entertainment market includes television, and identifiable submarkets such as professional sports, professional team sports, and specialized television sports programming.

*No. 16*: The NASL contends that the leagues also compete with each other in a market for "sports ownership capital and skill," whose boundaries are confined to individuals presently owning controlling interests in major league sports teams. I find, however, that to the extent a "sports ownership capital and skill" market exists, its boundaries are significantly wider than the NASL suggests. The market includes sports-minded, wealthy individuals who are not presently team owners, but would be receptive to an attractive investment opportunity in the field; and corporations of the type previously and presently involved in professional sports team ownership.

*No. 17*: As for individuals, the NASL's perception of a "sports ownership capital and skill" market is based upon an archetypal figure I came to know during the trial. I shall call him, for lack of a better word, the "sportsman." The sportsman has these distinguishing characteristics: love of sport; love of the limelight (or at least a willingness to be exposed to public view); substantial capital and a readiness to risk it in ventures with the potential for large short-term losses; and, in some cases, a familial affection for the city in which his teams perform. Sportsmen who testified during the trial included Lamar Hunt of Dallas; Joseph Robbie of Miami; Leonard Tose of Philadelphia; Edward Bennett Williams of Washington; Aaron Fogelman of Memphis; and Peter Pocklington of Edmonton. Just as some successful individuals turn for their extracurricular fulfillment to music (Avery Fisher Hall), rare books (the Beinecke Library), or fine art (the Frick Museum), so these individuals, at various stages in their personal races through life, have turned to professional sports.

*No. 18*: The paths by which individuals come to professional sports team ownership vary, as do the individuals themselves. Hunt has for a number of years focused his energies and largely inherited fortune upon a variety of sporting ventures: controlling ownership of the NFL Kansas City Chiefs and the NASL Dallas Tornado, as well as a leading role in professional tennis tournaments. Williams acted as attorney for other individuals who owned the Redskins, eventually acquired a controlling ownership himself, and recently expanded his sports interests to ownership of the baseball Baltimore Orioles. Pocklington was a businessman (meatpacking, car dealership, real estate development) who acquired his first sports ownership interest in the Edmonton Oilers (then of the now defunct World Hockey Association, now a National Hockey League team) as the result of a casual exchange with a friend. Tose is chairman of an interstate trucking company, who in 1969 acquired a minority interest in the Philadelphia Eagles, and now owns 99 per cent of the team. These individuals illustrate the ways in which, from various walks of life, one can become a professional sports team owner, frequently without prior experience in the field.

*No. 19*: Corporate owners have been a significant factor in American professional team sports. The NFL's by-laws prohibit corporate ownership as a matter of policy, but the other four major leagues do not. Major league baseball currently has 10 corporate investors in control group positions; the NASL has 8 (including Molson Breweries' recent acquisition of the Philadelphia franchise); the National Basketball Association has 3; and the National Hockey League 8. Thus 29 corporations hold controlling interests in four major sports leagues. The industries most heavily represented among corporate sports owners are those involved in consumer products sold to sports fans (beer, soft drinks and other beverages, cigarettes, home building supplies), or in communications, which market sports. Many other corporations, not currently sports owners, fit this profile. There are also a number of corporations in other fields that are identified with a particular city, and have invested in one of that city's professional teams.

*No. 20*: Shifts between individual and corporate ownership occur. We have noted the sale of the Philadelphia NASL franchise by a limited partnership of individuals to a corporation. Conversely, I may judicially notice that some years ago, CBS, a communications corporation, sold the baseball New York Yankees to a group of individuals headed by George Steinbrenner, who conforms neatly to the "sportsman" profile described in Finding No. 17.

*No. 21*: The presence of potential individual or corporate investors in professional sports precludes an effort to confine the boundaries of a "sports ownership capital and skill" market to present major league sports owners. While the NASL has been relatively unsuccessful in recent years in attracting potential investors, that is because the league has lost increasing amounts of money over the years. In 1979, for the second consecutive year, every NASL team operated at a loss, with some teams losing in excess of $2,000,000; and the NASL teams showed an aggregate operating loss of over $20,000,000, the most in the NASL's history. By way of contrast, when the NFL, a consistently profitable league, expanded by adding the Seattle and Tampa Bay franchises in 1974, the league had no difficulty attracting competing bidders. The capital resources of potential sports investors are reasonably interchangeable with those of present investors.

## V. MARKETS IN WHICH CONSTITUENT MEMBER TEAMS OF A SPORTS LEAGUE COMPETE WITH EACH OTHER

*No. 22*: Member teams of the NASL and NFL, as in the other major sports leagues, are separate legal entities. Within a professional sports league, the member teams compete with each other in certain identifiable markets. These include competition for player services, and, where two teams of the same league play in the same geographical area, competition for the loyalty in the hearts, and dollars in the pockets, of local sports fans, as well as coverage in the local media.

*No. 23*: However, in markets where the competition pits one league against another, with joint league activity neither implicating nor impinging upon competition between member teams, the league acts in fact as a single economic entity. That is the situation with respect to competition in the identifiable economic markets revealed by the evidence in this case.

## VI. THE RELATIVE POSITIONS OF THE NFL AND NASL AMONG PROFESSIONAL TEAM SPORTS

*No. 24*: In the past decade, the NFL has been the most successful professional sports league in the United States with respect to average per-game attendance, network media revenues and coverage, average value of franchises and total league-wide and per-club revenues.

*No. 25*: Soccer is one of the fastest growing sports in the United States on both the amateur and professional sports levels.

*No. 26*: Since 1968, professional soccer has experienced substantial and accelerat-

ing growth in fan interest, media following, paid attendance, number of franchises and geographic scope, and the NASL has emerged as the leading professional soccer league in the United States.

*No. 27*: The NASL and its predecessor leagues have engaged in the business of presenting professional soccer in the United States continuously for approximately 13 years. Compared to the other major professional sports leagues in football, baseball, basketball and hockey currently competing with the NASL in the U. S. professional sports, professional team sports and television programming markets, the NASL is by far the youngest, the least mature, and the most recent entrant.

*No. 28*: In order to compete with these other pre-existing professional sports leagues, the NASL needs to: (i) develop fan and media interest in a relatively new sport, (ii) attract and maintain sufficient sources of capital and entrepreneurial skill, and (iii) gain access to suitable stadium facilities.

*No. 29*: As a relatively new professional sports league, the NASL must also develop fan loyalties and interest.

*No. 30*: In the past decade, which included the early years of NASL history, each of the other major professional sports leagues—the NFL, Major League Baseball ("MLB"), the National Basketball Association ("NBA") and the National Hockey League ("NHL")—all exceeded the NASL in per-game attendance and seasonal attendance, and at least the NFL and Major League Baseball exceeded the NASL in gross media revenues received.

*No. 31*: The NFL and Major League Baseball are approximately equivalent in public popularity and financial health, followed by the other major professional sports leagues in basketball, hockey and soccer. The NFL is not "dominant" over its competitors. The NFL seeks to compete with the NASL and other professional sports leagues and to develop a totally independent strategy for the marketing of its products.

*No. 32*: Competition between the NASL and NFL has grown over the past few years because of the similarity between the two sports and the overlaps between their seasons, their franchise locations and, in some cases, their stadiums.

*No. 33*: While the ability of professional sports teams to operate at a profit depends upon several factors, including league-wide and local television and radio revenues, gross attendance, ticket prices, stadium size, local population (i. e., spectator base) and the success of a particular team on the playing field, the existence of a lucrative network television contract is particularly important. In that regard, the NFL has far outstripped the NASL. The NFL currently enjoys contracts with the three major television networks which yield about $650 million over four years, or $5,200,000 per team per year. In 1979 the NASL's network television contract provided only $500,000, or $21,000 per team.

*No. 34*: The NASL has undergone a continuing process of change and experimentation in ownership and franchise location over the past eleven years. Since the NASL's formation in 1968, through the time of trial, 41 NASL franchises have either been sold, moved or ceased operations and 25 franchises have, at one time or another, been added to the league.

*No. 35*: Apart from the divestiture of NASL ownership interests which could result from implementation of the NFL Constitution and By-law amendment in issue in this litigation, at least seven NASL franchises were at the time of trial seeking refinancing or transfers of club ownership and/or locations.

VII. *THE STRUCTURE OF NASL AND NFL OWNERSHIP*

*No. 36*: One of the NFL's ownership policies is that, as far as possible, each NFL team have a 51% controlling owner. Thus, the number of NFL owners with operational control of NFL teams (by virtue either of majority ownership or a position such as managing general partner or chief executive officer) is less than 50. Another of the

NFL's ownership policies is that the controlling owner of NFL teams cannot be a corporation whose primary business purpose is not the ownership and/or operation of an NFL team.

*No. 37*: Current NFL and NASL owners vary in their capital resources, personal entrepreneurial skills devoted to the activities of their team, public visibility and risk-reward incentives.

*No. 38*: There are similarities between the operation of the NASL and its teams and the operation of the NFL and other professional sports leagues and their teams. Many of these similarities involve the sort of operations usually handled by a small group of controlling owners and/or employee managers. Many investors in sports teams take no active role in these matters.

*No. 39*: Twelve NASL franchises are currently owned in whole or in part by individuals (or, in one case, the spouse of an individual) with an ownership interest in a team in another professional team sports league.

*No. 40*: At the time suit was commenced, four NASL franchises—i. e., those owned by Lamar Hunt, the Robbie family, Peter Pocklington and Madison Square Garden Corporation—involved controlling ownership simultaneously in two or more major sports leagues. The other NASL cross-ownership situations involved persons or corporate entities which are either (a) controlling interest holders in one league and minority investors in another league, (b) minority investors in more than one league, or (c) in one instance, a holder of controlling interests in both an NASL team and a minor league professional baseball franchise. Since that time, the press has reported the sale of the NASL Philadelphia franchise to Molson Breweries of Montreal, a corporation which also owns the NHL Montreal Canadians. The press has also reported the decision of Madison Square Garden Corporation to sell its NASL franchise, the Washington Diplomats.

*No. 41*: As of the date of the commencement of this action, the ownership of four NASL clubs involved cross-ownership with NFL clubs. Lamar Hunt was the individual controlling owner of the NFL Kansas City Chiefs and the NASL Dallas Tornado. Joseph Robbie was the controlling owner of the NFL Miami Dolphins, and his wife Elizabeth the controlling owner of the NASL Fort Lauderdale Strikers. William Bidwill had an individual controlling interest in the NFL St. Louis Cardinals, and a 3 per cent interest, without active management participation, in the NASL California Surf. Certain individual beneficial owners of the NFL Seattle Seahawks also had interests in the NASL Seattle Sounders. NASL/NFL cross ownership in respect of the Seattle franchises was subsequently eliminated. The situation in respect of Hunt, the Robbie family, and Bidwill remains unchanged. If the NFL cross-ownership ban forming the subject matter of this litigation is implemented, Hunt, the Robbies, and Bidwill must divest themselves of their NASL interests if they wish to retain their NFL interests.

*No. 42*: A number of NFL and American Football League ("AFL") owners were investors in the NASL or its predecessor entities prior to 1969. Of this initial group of NFL/AFL owners, all but Mr. Hunt and Mr. Bidwill disposed of their NASL interests before 1969. Mr. Hunt thereafter played a significant role in the growth and development of the NASL, particularly during its early years.

*No. 43*: Because teams in a professional sports league are interdependent (see Finding Nos. 13 and 14, *supra*), strong franchises and respected, active owners are important to a league's stability and future. The presence of Hunt and the Robbie family as NASL owners has been of significant assistance to the league in attracting additional owners and capital, and in creating in the eyes of the media and the public an aura of stability and "credibility" for the NASL. Their departure, should the NFL cross-ownership ban be implemented and these individuals decide to divest themselves of their NASL interests, would have a significantly adverse effect upon the NASL. Comparable circumstances do not exist with respect

to Bidwill, a minor and inactive NASL owner.

*No. 44*: There is no persuasive evidence that any other NFL owner, or member of his family, has seriously entertained a desire to purchase an NASL franchise, or been deterred from doing so by the NFL policy against cross-ownership. While the NASL has made repeated efforts to interest NFL owners in NASL franchises, and NFL owners have on occasion referred to the NFL cross-ownership policy as an obstacle to further consideration, in point of fact NFL owners have been unreceptive to NASL overtures for two primary reasons: their evaluation of an NASL franchise as a bad investment; and agreement with the longstanding NFL policy (see Findings Nos. 45–47, *infra*) that sports team owners should not divide their energies or loyalties.

## VIII. *THE NFL'S CROSS–OWNERSHIP POLICIES*

*No. 45*: Pete Rozelle became the NFL commissioner in 1960, and holds that position today. During the 1950's a prior commissioner, Bert Bell, had expressed the view that an NFL owner should not acquire a controlling interest in another major league sports team. Bell articulated this policy as a matter of general principle, not directed at any particular rival league, but grounded in notions of conflict of interest, and the desirability of an NFL owner giving his undivided loyalties and energies to that league. An early manifestation of the policy occurred when Bell urged the owner of the NFL Baltimore franchise to abandon plans to acquire the baseball Baltimore franchise. Rozelle found himself in agreement with this policy when he became NFL commissioner, and took the same position in comparable situations in the early 1960's.

*No. 46*: The NFL's cross-ownership policy was not reduced to writing until 1967. At a special league meeting on January 16 of that year, representatives of the 16 teams which then comprised the league unanimously passed the following resolution:

"RESOLVED that the National Football League does reaffirm its traditional position that no person having operating control of a franchise in the National Football League may acquire or possess control, directly or indirectly, of any other team sports enterprise or business, and that league counsel is instructed to draft appropriate amendments to the Constitution and By-Laws and necessary related resolutions defining the word 'control' for the purpose of this resolution."

*No. 47*: In June of 1966, the NFL and the American Football League ("AFL") had announced an intent to merge. The formal merger agreement was signed on December 1, 1967. The Kansas City Chiefs, owned by Lamar Hunt, was one of the AFL teams merged into the NFL. Full implementation of the NFL/AFL merger took place in 1970.

*No. 48*: Although the NFL 1967 resolution called for the drafting of Constitutional and By-Law amendments to ban cross-ownership, no such drafts were in fact prepared for a number of years. The cross-ownership subject continued to be discussed at league meetings, the ranks of NFL owners now swelled by the addition of the former AFL owners. Then, in a meeting of representatives of the 26 teams on May 23, 1972, the league voted 26–0 in favor of the following resolution:

"RESOLVED, that no person owning a majority interest in or in direct or indirect operational control of a member club may acquire any interest in another major team sport. Additionally, any person holding such financial interest at the time this Resolution is adopted will in no case increase his percentage of such interest in another major team sport. The adoption of the foregoing Resolution shall not affect nor modify the provisions of Article III, Section 3.5 of the Constitution and By-Laws."

The minutes of the meeting also state: "In the discussion, *major team sport* was defined as major league basketball, hockey, baseball and soccer, and all agreed that there would be a best effort made to dispose of current holdings."

Comparable resolutions were enacted in succeeding years up to 1978, with the exception of 1975, when the subject was omitted from the agenda by inadvertence.

*No. 49*: At the time of the NFL/AFL merger, Hunt held a minority interest in the NASL's Dallas franchise. By additional purchases in 1968 and 1970, he acquired a controlling interest in that team. Thereafter Hunt signified his agreement to use his "best efforts" to dispose of his NASL interests, in compliance with the NFL's 1972 resolution; but he has taken no affirmative steps to accomplish such a divestiture.

*No. 50*: In the mid-1970's, Hunt continued to play an active part in the affairs of the NASL. In addition to serving on league committees, he joined in efforts to interest potential investors. Hunt aroused the particular irritation of NFL owners in Philadelphia and Minnesota when he made public declarations in those areas, extolling professional soccer and its future prospects.

*No. 51*: In consequence, the discussion of the cross-ownership ban in more recent NFL meetings focused increasingly upon Hunt, and his lack of progress in divesting himself of his NASL interests. The NFL owners also expressed concern with the situation posed by the Robbies, the league having learned that Mrs. Robbie had become controlling owner of the NASL Fort Lauderdale franchise, thereby creating NFL and NASL ownerships within the same family. The personal animus expressed by the more concerned NFL owners was more intense in respect of Hunt than the Robbies.

*No. 52*: These more recent events culminated in the proposed amendment to the NFL by-laws quoted *supra*, upon which the NFL was scheduled to vote in October, 1978, thereby triggering this action. The proposed by-law goes beyond the scope of the prior resolutions, in that family members of NFL owners are included within its prohibition, and a time within which divestiture must be accomplished is specified, with substantial monetary penalties for non-compliance.

*No. 53*: While Rozelle, in contemporaneous memoranda and his testimony at trial, suggested other policy reasons in favor of the cross-ownership ban contained in the proposed amendment, it is clear that a significant motivating force lies in the perception of certain NFL owners and Rozelle that cross-ownership between the NFL and NASL strengthens the NASL in its efforts to compete with the NFL.

These constitute the Court's findings which I deem necessary to resolution of the case. The parties have agreed upon other facts, and their omission from the foregoing paragraphs is not intended to suggest that I reject their accuracy.

## DISCUSSION

The NASL's complaint concludes with four specific prayers for relief:

Paragraph (1) asks that the "alleged offenses" of the defendants be adjudged and declared in violation of the Sherman Act, § 1. Paragraph 2 prays for a permanent injunction against any agreement (including NFL constitution of by-law provisions) "that restricts the ability of any person to maintain, expand or acquire an ownership interest in an NASL franchise." Paragraph 3 prays for the enjoining of:

"... any contract, combination or conspiracy unreasonably restraining trade in the U.S. professional sports or entertainment markets, including any such agreements: (a) unreasonably restricting the access of NASL teams to stadiums or other playing facilities; (b) impairing the ability of the NASL to secure or expand network television contracts; and (c) restricting NFL trademark licensees from using advertisements or promotions dealing with the NASL and/or its trademarks."

Paragraph 4 prays for treble damages.

■ The proof at trial focused almost exclusively upon the cross-ownership ban, the enjoining of which the NASL seeks in paragraph 2 of its prayers for relief. Paragraph 45(b) of the complaint alleges additional unreasonable restrictions of trade— "restricting the access of NASL franchises

to stadiums, impairing the ability of the NASL and its members, until recently, to negotiate network or local television contracts, and restricting the ability of third-party licensees of the NFL trademarks to deal with licensees"—which underlie paragraph 3 of the prayers for relief. However, no significant evidence was adduced in support of these additional alleged violations, either as to the merits or resulting damages; and the NASL's proposed findings of fact and post-trial memoranda are silent in respect of them.[1] These claims may accordingly be deemed abandoned. I turn, then, to the cross-ownership ban, upon which the parties concentrated their energies.

This Court preliminarily enjoined implementation of the cross-ownership ban because the NASL demonstrated a substantial threat of immediate irreparable harm, and the existence of sufficiently serious merits questions to make them a fair ground for litigation. 465 F.Supp. at 668.

The Court also ruled, in the context of the preliminary injunction motion, that the legality of the ban should be judged by the rule of reason. The parties had urged different approaches. The NASL, viewing NFL teams as horizontal competitors, characterized the ban as a boycott, illegal *per se.* The NFL viewed itself, within the relevant market, as a single economic entity, so that Sherman Act § 1 concepts did not apply. These contentions were originally asserted on the basis of affidavits and memoranda of law. Following extensive discovery and a full trial, they are reasserted with undimin-

ished vigor. That is as it should be. The Court's prior opinion does not foreclose the NASL's argument, asserted after trial, that the proof discloses a *per se* § 1 violation. By the same token, the Court's prior opinion does not foreclose the NFL's argument, asserted after trial, that the requisite joint action under § 1 is not present. That is so, notwithstanding this Court's earlier statement that "there is no serious dispute but that enactment of the proposed by-law amendment would constitute an agreement among the NFL and its member teams sufficient to satisfy the 'contract, combination . . . or conspiracy' language of section 1 of the Sherman Act." 465 F.Supp. at 672. In point of fact, the NFL hotly disputes that proposition.

These assertions must be considered anew, in the light of discovery and a full trial record. I begin with the NFL's contention that its conduct, as revealed by the evidence, does not fall within the Sherman Act, since if that position is well founded, certain other questions do not arise.

The NFL regards itself as "a single economically-integrated competitor," or "a single economic actor." NFL pre-trial brief at 7, 17. The NASL responds that this "single economic firm" defense "disregards more than twenty years of decisions . . . which consistently have applied Section 1 of the Sherman Act to the NFL defendants." NASL post-trial brief at 129. Those antitrust cases involving the NFL cited in the margin [1a] the NASL refers to collectively as

---

1. The NASL submitted, as part of its post-trial presentation, a helpful annotated complaint, which cross-referenced the allegations of the complaint to the NASL's proposed findings of fact. The only proposed finding relating to ¶ 45(b) of the complaint is No. 99, which reads in its entirety:

    "The NFL defendants' prior cross-ownership ban has caused damage to the business and property of the NASL plaintiffs, in an amount to be determined at trial, by depriving the NASL and its member clubs of needed infusions of new capital and sports entrepreneurial skill, which, in turn, has:
    "(a) prevented the market value of NASL franchises from rising to the levels which they would have achieved under normal supply and demand conditions;

    "(b) resulted in the loss of revenues from reduced fan popularity, attendance and support;
    "(c) reduced the current and projected value of NASL television contracts;
    "(d) resulted in the loss of revenues from reduced stability and loss of goodwill; and
    "(e) imposed substantial additional costs upon the NASL in seeking new sources of sports ownership capital and skill."
    It is apparent that this proposed finding relates solely to the cross-ownership ban, and has nothing to do with the *additional* antitrust violations alleged in the complaint.

1a. *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Smith v. Pro-Football, Inc.,* 593 F.2d 1173 (D.C.

the "NFL Defendants' Antitrust Liability Cases." In addition, the NASL says that "Section 1 has also been consistently applied to other professional team reports," *ibid.*, the relevant citations also appearing in the margin.[2]

We must consider the extent to which the NFL's present argument is foreclosed by prior decisions.

### A. *Antitrust Cases Involving the NFL.*

The NFL's first reported encounter with the antitrust laws appears in *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953). The government sued to enjoin enforcement of NFL by-laws governing the telecasting and broadcasting of NFL games. A provision preventing the telecasting of outside games into the home territories of other teams, on days when the other teams are playing at home, was characterized by Judge Grim as "a clear case of allocating marketing territories among competitors, which is a practice generally held illegal under the antitrust laws." 116 F.Supp. at 322. Nonetheless, that provision, intended to protect the home ticket sales of the weaker clubs and thus permit their continued competitive existence, was sustained as a reasonable restriction, and a legal restraint of trade, the court concluding:

> "The League is truly a unique business enterprise, which is entitled to protect its very existence by *agreeing* to reasonable restrictions on its member clubs." *Id.* at 326.

More restrictive provisions were held illegal, in the absence of evidence of salutary effect "on the attendance and gate receipts of a team's home games." *Id.* at 326. The court found it unnecessary to reach the NFL's contention, based on the Supreme Court's baseball games,[3] that professional football was not engaged in interstate commerce, since the restrictions "by professional football on the sale of radio and television rights impose substantial restraints on the television and radio industry," whose presence in interstate commerce was sufficient to implicate the antitrust laws. *Id.* at 327–8.[4]

In *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), the Supreme Court answered the question left open by the district court in *United States v. National Football League*, *supra*. The complaint alleged the following. Plaintiff, a football player, broke his contract with the NFL's Detroit Lions and signed with a rival league. Following disbanding of that league, plaintiff sought employment with an NFL-affiliated league. The NFL then announced plaintiff was black-listed, which prevented his employment in organized football in the United States. Plaintiff alleged this conduct violated §§ 1 and 2 of the Sherman Act. The NFL moved to dismiss the complaint on the basis of the baseball cases. The Court declined to extend its baseball exemption to football, and held that the complaint sufficiently alleged a cause of action under the Sherman Act.

Cir. 1977); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C.Cir. 1977); *Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976); *Los Angeles Memorial Coliseum Commission v. NFL ("Coliseum II")*, 484 F.Supp. 1274 (C.D.Cal.1980), *stayed pending appeal* (9th Cir. 1980); *Los Angeles Memorial Coliseum v. NFL ("Coliseum I")*, 468 F.Supp. 154, 164 (C.D.Cal.1979); *Bowman v. NFL*, 402 F.Supp. 754 (D.Minn.1975); *Kapp v. NFL*, 390 F.Supp. 73 (N.D.Cal.1974), *appeal vacated*, 586 F.2d 644 (9th Cir. 1978).

2. *Linseman v. World Hockey Association*, 439 F.Supp. 1315 (D.Conn.1977); *Robertson v. National Basketball Association*, 389 F.Supp. 867 (S.D.N.Y.1975); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp. 462 (E.D.Pa.1972); *Denver Rock-

ets v. All-Pro Management, Inc.*, 325 F.Supp. 1049 (C.D.Cal.1971), *stay vacated*, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971).

3. *Federal Baseball Club v. National League*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922); *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953). These cases rejected antitrust challenges to organized baseball's "reserve clauses" in player employment contracts.

4. The district court's subsequent implementation of its ruling, 196 F.Supp. 445 (E.D.Pa. 1961), led to its statutory overruling, P.L. 87–331 (1961), in which Congress authorized the NFL clubs to sell their television rights jointly.

Player relations lie at the heart of several other cases the NASL cites. *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C.Cir.1978), held the NFL player draft to be an unreasonable restraint on trade in violation of § 1 of the Sherman Act. *Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), held that the so-called "Rozelle Rule," restricting the movement of free agents between teams, was unlawful. *Kapp v. National Football League*, 390 F.Supp. 73 (N.D.Cal.1974), *aff'd on other grounds*, 586 F.2d 644 (9th Cir. 1978), held that the Rozelle Rule, NFL player draft, the "no tampering rule," and the Standard Player Contract violated the antitrust laws. In *Bowman v. National Football League*, 402 F.Supp. 754 (D.Minn.1975), the district court preliminarily enjoined an NFL resolution barring the hiring in 1975 of players and coaches who had participated in the rival World Football League.

The *Los Angeles Coliseum* case, presently pending on appeal to the Ninth Circuit, involves an NFL by-law governing the location of its member clubs. Plaintiff operates the Los Angeles Coliseum, which has been vacated by the recent decision of the NFL's Los Angeles Rams to play their home games in Anaheim, a city located south of Los Angeles in Orange County, California. The Oakland Raiders, another NFL team, thereupon announced its desire to play *its* home games at the Coliseum. That move is presently balked by an NFL by-law requiring that the transfer of a playing site be approved by three-fourths of the NFL member clubs. In *Coliseum I*, 468 F.Supp. 154, Circuit Judge Pregerson (sitting by designation), held that the NFL by-law implicated the antitrust laws, but that plain-

tiff had not yet demonstrated standing to attack the by-law under §§ 1 and 2 of the Sherman Act. In *Coliseum II*, 484 F.Supp. 1274, the proposed Raiders move having been clarified, Judge Pregerson concluded that plaintiff had standing, and preliminarily enjoined enforcement of the by-law on a rule of reason analysis.

The NASL's last "NFL Defendants' Antitrust Liability Case," *Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C.Cir. 1977), does not in fact address the question of league liability. The promoters of an American Football League franchise in Washington, D.C. sued the operator of the NFL's Washington Redskins and the operator of the Robert F. Kennedy Stadium. A restrictive covenant in the Redskins' stadium lease prevented the stadium from being used by any other professional football team. Plaintiffs alleged that the stadium was the only suitable facility for professional football games in Washington, and that the restrictive covenant in the lease, which prevented plaintiffs from establishing an AFL franchise to compete with the Redskins in the Washington professional football market, violated §§ 1 and 3 of the Sherman Act. Following a jury verdict in defendants' favor, the court of appeals reversed and remanded on the basis of the trial judge's erroneous instructions.

### B. *Antitrust Cases Involving Other Professional Team Sports.*

The Sherman Act cases involving other professional team sports cited by the NASL, see n. 2 *supra*, all concern restrictions of one kind or another upon a team's ability to negotiate for or sign a player to a contract.[5]

---

**5.** *Linseman v. World Hockey Association, supra* (WHA rule requiring that players be 20 years old, challenged by 19-year old Canadian amateur); *Robertson v. National Basketball Association, supra* (players attacked reserve clause, uniform player contract, and college draft); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., supra* (WHC, plaintiff league, attacked defendant NHL's reserve clause, standard player contract, and affiliation agreements; preliminary injunction granted on ground that NHL, with its dominance over professional major league hockey market, probably violated § 2 of Sherman Act by its efforts to preclude players whose contracts had expired from joining WHC teams; holding under Sherman Act § 1 reserved until trial); *Denver Rockets v. All-Pro Management, Inc., supra* (players attacked NBA by-law prohibiting players from negotiating with NBA team until four years after graduation from high school).

Two other professional sports league antitrust cases should be noted. In *San Francisco Seals v. National Hockey League*, 379 F.Supp. 966 (C.D.Cal.1974), an NHL member wishing to move its club from San Francisco to Vancouver challenged by-laws requiring league approval of such a transfer, that approval having been denied. The district court found no Sherman Act violation.

In *Levin v. National Basketball Association*, 385 F.Supp. 149 (S.D.N.Y.1974), prospective team purchasers sued the NBA, which had denied their application. The district court found no Sherman Act violation.

### C. Further Analysis of the Professional Sports League Antitrust Cases.

The NFL and NASL, together with other professional sports leagues, compete in the entertainment industry.[6] The primary economic competition involving professional sports leagues occurs between and among the competing leagues.[7] The NFL submits that, in such competition, it acts as a single economic entity, thus precluding application of Sherman Act § 1. May I accept that submission, as the NASL argues, only by disregarding years of contrary authority, contained in the cited cases?

No case is directly in point. A professional sports league's ability, within the context of antitrust law, to condition participation of an individual in its ownership ranks upon non-participation in a competing league has never previously been litigated, in the Supreme Court, the Second Circuit, or elsewhere. Therefore the principle of *stare decisis* does not arise. I may accept the NFL's submission without branding myself a judge willing "stubbornly to persist in his views on a particular issue after the contrary had become part of the tissue of the law." Frankfurter, J., dissenting in *Radovich, supra*, 352 U.S. at 455, 77 S.Ct. at 396. But the NFL has urged its single economic entity concept in certain of

the prior cases, without total success. I must consider whether those cases point the way to proper resolution of the case at bar.

The NASL says that, in advancing its single economic entity concept, the NFL seeks "a flat grant of immunity from Section 1" (post-trial brief at 131). That is an overstatement. The NFL did, indeed, claim total immunity from Sherman Act coverage in *United States v. National Football League, supra*, and *Radovich, supra*; but *Radovich* sounded the death knell of the immunity claim, and all subsequent cases recognize that the conduct of professional sports leagues (save for baseball's charmed circle) may implicate antitrust law. The issue in prior cases, and the case at bar, is whether *the particular conduct involved* violates that law. Addressing that issue, several leagues have made the single economic entity argument. They are hardly undefeated, but have not been entirely shut out in judicial arenas.

In *San Francisco Seals Ltd. v. National Hockey League, supra*, the district court held the Sherman Act inapplicable to a member club's attack on a league by-law requiring league approval of a franchise transfer. "It is fundamental in a section 1 violation," the court wrote, "that there must be at least two independent business entities accused by combining or conspiring to restrain trade." 379 F.Supp. at 969. Within the relevant market, namely "the production of professional hockey games before live audiences," *ibid.*, the requisite plurality did not exist between plaintiff club and the other defendant clubs; nor did the by-law restrain trade. Those propositions followed from the nature of a sports league. The court observed:

"Within the relevant market in which we are here concerned, plaintiff and defendants are not competitors in the economic sense. It is of course true that the member teams compete among themselves athletically for championship honors, and they may even compete economically, to a

---

6. Finding No. 8.

greater or lesser degree, in some other market not relevant to our present inquiry. *But, they are not competitors in the economic sense in this relevant market. They are, in fact, all members of a single unit competing as such with other similar professional leagues.* Consequently, the organizational scheme of the National Hockey League, by which all its members are bound, imposes no restraint upon trade or commerce in this relevant market, but rather makes possible a segment of commercial activity which could hardly exist without it." *Id.* at 969–970 (emphasis added).

Judge Owen of this Court adopted the rationale of *San Francisco Seals* in *Levin v. National Basketball Association, supra.* The NBA constitution required a three-fourths vote of the membership to approve a transfer of membership. Plaintiffs applied to purchase the Boston Celtics, and challenged the constitutional requirement when the league rejected the application. The court dismissed the antitrust complaint. Judge Owen accepted the NBA's self-characterization as a "joint venture," and then observed:

"Each of its joint venturers holds a franchise to operate a team. While the teams compete vigorously on the basketball court, the joint venturers are dependent upon one another as partners in the league format to make it possible." 385 F.Supp. at 150.

Plaintiffs' proof was that the league members rejected their application because they were friendly with an unpopular and divisive club owner. Accepting that theory in the context of defendants' motion for summary judgment, Judge Owen held that the league members' reason for rejection "was not an anti-competitive reason," and had "neither anti-competitive intent nor effect." *Id.* at 152. The court stated:

"While it is true that the antitrust laws apply to a professional athletic league, and that joint action by members of a league can have antitrust implications this is not such a case. Here the plaintiffs wanted to *join* with those unwilling to accept them, *not to compete with them*, but to be partners in the operation of a sports league for plaintiffs' profit." *Ibid.* (emphasis in original; footnotes omitted).

Plaintiffs had relied on *Denver Rockets v. All-Pro Management, Inc., supra,* one of the player contract restriction cases discussed at n.2 *ante*; but Judge Owen found *San Francisco Seals, supra,* more in point:

"The distinguishing difference, in my opinion, is that the limiting by-law attacked in *Denver Rockets* prevented a player from entering and competing with other players in the players' market, whereas in this case the plaintiffs wanted to become partners with, not competitors of, those who excluded them. I find more applicable the rational [sic] of *San Francisco Seals, Ltd. v. National Hockey League*, 379 F.Supp. 966, (C.D.Cal., 1974). In that case the Court found no antitrust violations and dismissed where the Board of Governors of the National Hockey League refused to permit plaintiff to transfer its franchise from San Francisco to Vancouver, B. C., where plaintiff presumably thought it could have a more profitable operation." *Ibid.* at n.6.

Sensing intimations of single economic entity immortality in *San Francisco Seals* and *Levin*,[8] the NFL urged the concept as a

---

**8.** Even in *United States v. National Football League, supra,* which the NFL doggedly characterizes as "wrongly decided" (pre-trial brief at 12 n. 2), the district court recognized "[p]rofessional football is a unique type of business. Like other professional sports which are organized on a league basis it has problems which no other business has." 116 F.Supp. at 323. In consequence, one of the television restrictions, otherwise suspect as an allocation of marketing territories, was permitted to stand because the

league, "a truly unique business enterprise," was "entitled to protect its very existence by agreeing to reasonable restrictions on its member clubs." *Id.* at 326; see discussion *supra.* The NFL's primary line of defense in *United States v. National Football League,* decided before *Radovich, supra,* foreclosed the issue, was that the NFL's activities did not affect interstate commerce. The "single economic entity" defense does not appear to have been asserted. Judge Grim upheld the restriction in question

defense to the antitrust claims of that disaffected athlete James McCoy (Yazoo) Smith in *Smith v. Pro Football, Inc., supra.* The argument failed. The *Smith* court acknowledged that "[t]he [NFL] clubs operate basically as a joint venture in producing an entertainment product—football games and telecasts." 593 F.2d at 1179. *Levin* and *San Francisco Seals* were cited, *ibid.* at n.19, as noting "joint venture" characteristics of the NBA and NHL. In consequence, the *Smith* court declined to condemn the NFL player draft as a *per se* illegal boycott between horizontal competitors. But the draft implicated antitrust law, and failed to survive rule of reason analysis, because of its "severely anticompetitive impact on the market for players' services," *id.* at 1183, a market in which the league members unquestionably competed with each other. Thus the NFL brief in *Smith* conceded that the draft 'restricts competition among the NFL clubs for the services of graduating college players,'" an anticompetitive purpose producing the intended anticompetitive effect:

> "The draft inescapably forces each seller of football services to deal with one, and only one, buyer, robbing the seller, as in any monopolistic market, of any real bargaining power. The draft, as the District Court found, 'leaves no room whatever for *competitors among the teams for the services of college players,* and utterly strips them of any measure of control over the marketing of their talents.'" *Id.* at 1185 (emphasis added).

Enter Sherman Act § 1; exit the player draft, under the rule of reason.

The NFL next sent the single economic entity concept in to call defensive signals in the *Los Angeles Coliseum* case. The litigation arose, it will be remembered, out of the Oakland Raiders' desire to move from the greater San Francisco area to play their home games in Los Angeles, and the eagerness of the Los Angeles Coliseum to receive them, the Los Angeles Rams having vacated the Coliseum to play at Anaheim, in neighboring Orange County. At issue is the validity of an NFL by-law restricting such a transfer. Circuit Judge Pregerson, preliminarily enjoining enforcement of the by-law, rejected the single economic entity defense. He commences his discussion by observing:

> "Whether NFL teams engage in economic competition as independent units is a troublesome question. The relationship between the teams does not fit the traditional competitive mold." 468 F.Supp. at 163.

While the court recognized the economic necessity of cooperation in certain areas, it also pointed out that the NFL teams are separately owned, do not share profits and losses, and "compete for college players and NFL players who are 'free agents.'" *Ibid.* Judge Pregerson then focused upon another area of competition, central to the case before him:

> "If another NFL team were to play its home games in the Coliseum, that team and the Rams would compete to some extent for fan support in the Southern California area and thus for ticket sales and other revenue." *Ibid.*

The court reached this conclusion:

> "The court concludes that competition for players and, depending on a team's location, competition for fans, indicates that the NFL teams are economic competitors, though not in the traditional sense. This view is supported by a number of cases where courts have held that the rules of a professional sports league violated § 1 of the Sherman Act. In reaching that conclusion, these courts necessarily found that the teams making up the league were engaged in economic competition." *Id.* at 164.

The citations which follow relate to sports league restrictions upon player contracts.

Granting a preliminary injunction in *Coliseum II,* Judge Pregerson stated:

> "The primary anticompetitive aspect of § 4.3 is fairly self-evident: a rule which inhibits teams from transferring their

---

by resort to the rule of reason. But Judge Grim's analysis may arguably be regarded as an old testament prophecy of a new message soon to be preached.

home locations may act to prevent an existing team from transferring into the Los Angeles-Orange County area to compete with a team already there for dollars in the pockets of sports fans. In addition, a rule which hinders a new NFL team from moving into Los Angeles would inhibit local competition for football players, coaches, and other personnel." 484 F.Supp. at 1277.[9]

These are the cases which consider the concept of the NFL as a single economic entity.[10] What conclusions may one draw? First, the courts do not reject the concept out of hand. On the contrary, Judge Grim's characterization of a professional sports league as "truly a unique business enterprise"[11] is echoed in later cases, most recently by Judge Pregerson's observation in *Coliseum I* that "[t]he relationship between the teams does not fit the traditional competitive mold." 468 F.Supp. at 163. But courts have rejected the NFL's defense, based upon the single economic entity concept, in the particular circumstances considered above. A tension unmistakably arises between the concept of a league, whose members must combine and cooperate if the league is to function at all, and the Sherman Act § 1's prohibition of *combinations* in restraint of trade, which requires the presence of "at least two independent business entities," *San Francisco Seals, supra*, at 379 F.Supp. 969.

▆▆▆▆ Analysis of the cases suggests a resolution of that tension. If member teams of a professional sports league compete with each other in an identifiable market, § 1 of the Sherman Act applies; the legality of restraints on such competition is judged by the rule of reason; and third parties damaged by illegal restraints may claim Clayton Act remedies. Thus the single economic entity defense fails in the player contract restriction cases, where all member teams compete with each other for players, and league restraint of that competition damages the players. Similarly, the defense fails where two member teams would compete in the same geographical area for sports fans' dollars, and league restraint of that competition damages a stadium operator. But if joint league conduct neither implicates nor impinges upon competition between the member clubs, then the professional sports league, that unique business enterprise not fitting the usual competitive mold, may properly be regarded as a single economic entity; and in those circumstances, § 1 of the Sherman Act has no office to perform.

That is so, even if the joint league conduct disadvantages another competitor in the entertainment industry. The distinction lies between competition and competitors. "The law is well established that it is competition, and not individual competitors, that is protected by the antitrust laws." *Levin, supra*, at 152, citing *Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876 (S.D.N.Y.1968), *aff'd*, 405 F.2d 319 (2d Cir. 1969), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Economic conduct may damage competitors. Indeed, it may be specifically designed to do so. There is nothing illegal in that. Competitors compete. The disadvantaged competitor's injury is compensable under the Clayton Act if, and only if, such injury is a

---

**9.** With respect, I am bound to say that the second perceived anticompetitive effect is less apparent. Competition among NFL teams for key personnel such as players and coaches is nationwide; *quaere* whether the presence of two teams in one playing area adds an extra dimension to this particular competition. But the direct competition between such teams for the limited amount of leisure time dollars "in the pockets of sports fans" in the same playing area cannot be gainsaid, and on my reading of the *Coliseum* opinions furnishes the *raison d'etre* for the Sherman Act § 1 preliminary injunction.

**10.** As noted *ante, Hecht v. Pro-Football, Inc.*, also cited by the NASL, considered a contract between a single NFL club and a wholly independent stadium operator which denied a vital resource (the stadium) to a competing NFL franchise. Concerted league activity was not involved; the requisite number of economic actors arose from the NFL club and the stadium operator. *Hecht* is not pertinent to the issue under consideration in the case at bar.

**11.** *United States v. National Football League, supra*, at 116 F.Supp. 326.

particularized manifestation of that greater public injury proscribed by the Sherman Act. This basic distinction was well stated by Judge Thomsen in *Schwing Motor Co. v. Hudson Sales Corp.*, 138 F.Supp. 899, 903 (D.Md. 1956), *aff'd*, 239 F.2d 176 (4th Cir. 1956), *cert. denied*, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957):

> "The main purpose of the anti-trust laws is to protect the public from monopolies and restraints of trade, and the individual right of action for treble damages is incidental and subordinate to that main purpose. (cases cited). Public injury alone justifies the threefold increase in damages. It is essential, therefore, that the complaint allege facts from which it can be determined that the conduct charged to be in violation of the anti-trust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce. (cases cited)."

If competition between the NASL and NFL truly pits league against league—an economic rivalry uncomplicated by competition between the league members *inter se* —then the sports league cases discussed *supra*, viewed in the light of established antitrust principles, appear to take this case beyond the boundaries of the Sherman Act, unless Supreme Court or Second Circuit authority in other antitrust areas require a different conclusion. I consider those questions in turn.

### D. *The Nature of the Competition Between the NASL and NFL.*

■ This question does not require extended discussion. Competition between the NASL and NFL in the entertainment industry is one on one: league against league. Judge Curtis was quite right in *San Francisco Seals, supra*, when he said that the "main purpose" of a professional sports league is "producing sporting events of uniformly high quality," the member teams "acting together as one single business enterprise, competing against other similarly organized professional leagues." 379 F.Supp. at 969. It is the league product—its sporting events—which competes against the comparable product of competing leagues. The NASL's product is NASL soccer. The NFL's product is NFL football. The other competing products are major league baseball, NHL hockey, and NBA basketball. The degree of competition grows greater as the traditional sports seasons expand under the influence of television marketing. When I was a child, I played as a child: baseball in summer, football in fall, hockey in winter. But now that commercial sports marketing has made me a man, I put away childish limitations, and sit before my television to watch hockey in late May, football in the heat of early August, and baseball in the chilly night winds of late October.[12] Competition between the NASL and NFL has grown in recent years, in part because their seasons overlap.[13] Increasingly, the seasons of all five major league sports overlap. The resulting competition is between sports events in the generic sense: professional football, soccer, baseball, basketball, and hockey. These are products which only the professional league, acting as a single entity, can manufacture.

This proposition is essentially undisputed. As noted *ante*,[14] the parties agree that the primary economic competition in professional sports "occurs between and among the competing leagues."

---

**12.** I may judicially notice, from the public press, that the NHL Stanley Cup final round's last game was played on May 24, 1980—over six weeks after the baseball season began on April 9. NFL pre-season football games were available on television during the first week in August. In 1979, baseball's World Series was not completed until October 17; the Series began this year on October 14. Last year the press featured photographs of baseball commissioner Kuhn, observing the World Series from his field box, *sans* topcoat or sweater in the cold October night, manfully pretending it was not cold. The NBA has confined itself somewhat more closely to what one thinks of as a traditional season, from mid-October to mid-May.

**13.** Finding No. 32. In recent years, the NASL has extended its play-off season into September, while the NFL commences its pre-season televised games in late July or early August.

**14.** See text at fn. 6, 7.

The reality of league against league competition is recognized by Louis Guth, the NASL's expert witness. In Guth's view, "major professional team sports is a submarket of the general entertainment industry." Affidavit at ¶ 24.[15] Within that entertainment industry submarket, all the major professional team sports leagues compete in at least three further submarkets:

(1) the major professional team sports market;

(2) the sports programming market;

(3) the market for sports ownership capital and skill. *Id.* at ¶ 14.

As to the first of these three perceived submarkets, the "major professional team sports market," Guth testified that "the primary 'product' offered is live attendance at league-sanctioned contests," generating ticket sale and ancillary revenues from the "buyers," members of the general public. *Id.* at ¶ 15. In my view, it is something of a misnomer to say that the "product" offered is "live attendance." Judge Curtis was closer to the mark in *San Francisco Seals* when he defined the product as "sporting events of uniformly high quality." "Live attendance" reflects the favor bestowed (at a price) by the buying public upon the product.[16] But it makes no difference, since in any event Guth agrees, in general, that because of a league's necessary interdependence, in many circumstances "economic competition by professional team sports leagues occurs most vigorously on a league-wide, intersport basis," *id.* at 21; and, in particular, "the major professional team sports market is a concentrated industry in which there are only live principal rivals ... The effectiveness of competition in the major professional team sports market thus depends on the level of rivalry between the five existing major leagues ...," *ibid.*

The second submarket, sports programming, also involves league against league competition. As Mr. Guth observes: "The same five major professional team sports leagues which participate in the professional team sports market also compete to sell broadcast rights to their games in the sports programming market," the principal buyers in that market being "the three major television networks." *Id.* at ¶¶ 39, 40. It is entirely clear from the evidence that, in this competition as well, each league acts as a single entity. The NASL and NFL bargain with the television networks by means of negotiating committees which speak for the entire league. That negotiation is crucial because, in today's market, a nationwide television contract is of great importance to a professional league's viability. The networks, in turn, evaluate the strength of the sports league's generic product as a competitor in the market for television viewers and advertisers, adjust the terms offered to the leagues accordingly, and compile their individual rating and market share statistics on the basis of the league sports, not the individual teams.[17]

Thus, in both these submarkets, the sports leagues compete with each other as single entities, offering products which, but for the concerted action of the member clubs, simply would not exist.

The NASL stresses that the NFL clubs are separate and distinct legal entities. That is true; and the separate nature of the clubs manifests itself in the various ways the NASL summarizes at 131–133 of its main brief after trial: the 28 NFL clubs maintain separate books, do not share profits or losses, do not share certain sources of revenue or expenses, contract in their own name in certain respects, have independent incentives to make their teams successful,

---

**15.** Under the Court's pre-trial order, the direct testimony of the parties' expert witnesses was submitted in affidavit form, followed by "live" cross and redirect examination at trial.

**16.** A legendary boxing manager is supposed to have replied, to a promoter extolling the virtues of a large arena in a remote location: "It's not the seats you've got, but the behinds you can put in them."

**17.** See Guth affidavit, Ex. 12, citing statistics tabulated by *Trends in Performance in Sports Programming*, CBG/National Television Research, March, 1979.

do not share all financial information, and each club is free to spend its profits as it chooses. I recognized in the decision granting the preliminary injunction that "[t]hough united in a joint venture, the NFL members are discrete business entities —individuals, partnerships and corporations—whose concerted action *can have* antitrust implications," 465 F.Supp. at 675 (emphasis added). The further questions to be answered on a full trial record are (1) whether the concerted actions of professional sports league members *always* have antitrust implications; and (2) if that concerted action does not restrain competition among the league members, whether the antitrust laws are implicated at all. On the basis of the professional sports league cases, as analyzed *ante*, both questions appear to call for negative answers.

The third relevant submarket identified by Mr. Guth and urged by the NASL is "the market for sports ownership capital and skill." Guth affidavit (admitted as the witness's direct testimony under the pre-trial order), at ¶ 14. This is characterized as a "factor market." Professional sports leagues are viewed as needing to acquire vital factors of production, and, to that end, compete to sell their franchises in a market for sports ownership capital and skill. *Id.* at ¶ 17. "Potential investors" can be viewed as the demand side of the market, with franchises viewed as the supply. *Id.* at ¶ 42. After analyzing the characteristics of a sports franchise owner, Guth concludes that "the most desirable owners for a league (and particularly for a new entrant) are (non-corporate) individuals with previous or concurrent sports ownership experience who are willing and able to purchase a controlling interest in a franchise and to provide it with access to substantial capital resources." *Id.* at ¶ 44. Individuals who are presently sports team owners are regarded by Guth in his trial testimony as constituting the "actual market," Tr. 1940–41, as opposed to the broader market of "potential investors" referred to in his affidavit at ¶ 42. The cross-ownership ban is condemned as anticompetitive because it deprives the NASL plaintiffs of NFL own-

ers as possible sources of sports ownership capital and skill, a particularly serious problem for a sport which Guth analogizes to an "infant industry." *Id.* at ¶ 59. The NASL's contention is summarized in its post-trial reply brief, at p. 46:

"... controlling NFL team owners comprise a significant (and highly desirable part) of a relevant market for sports ownership capital and skill ... Group restrictions on the investment decisions of such owners, therefore, necessarily constitute an unreasonable restraint of trade."

The NFL's response, based upon the testimony of its expert witness, Bruce Caputo, is that the NASL is a business, whose "capital and skill requirements can be studied in much the same manner as those of other businesses." Caputo affidavit at ¶ 7. "Capital is fungible, and there is a capital market; ... In the case of the North American Soccer League, the capital market in question is worldwide ... I do not believe that there is a meaningful separate market composed of 'especially desirable sports ownership capital' as plaintiffs contend." *Id.* at ¶¶ 8, 14, 15. The NFL's pre-trial brief, at p. 36, characterizes Caputo's testimony as explaining "the impropriety of substituting for the real-world capital market an artificial alleged market containing only those capital suppliers deemed 'most desirable' by plaintiffs."

■ The NASL, as plaintiff, bears the burden of proving the existence of the submarket in which competition is said to be restrained. Definitions of "market" within the antitrust context "will vary with the part of commerce under consideration." *United States v. E. I. du Pont & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). We are considering the capital market. Both parties agree there is one. The issue is the reach of its boundaries. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 325, 82 S.Ct.

1502, 1523, 8 L.Ed.2d 510 (1962). Definitional precision is not possible; "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *du Pont, supra,* 351 U.S. at 395, 76 S.Ct. at 1007. A submarket exists where the products in question "have sufficient peculiar characteristics and uses to constitute them products sufficiently distinct" from all other products to make them a "line of commerce" within the meaning of the antitrust laws. *United States v. du Pont & Co.,* 353 U.S. 586, 593–94, 77 S.Ct. 872, 877–78, 1 L.Ed.2d 1057 (1957). The existence of "marked differences" between products or services militates against a conclusion that "the interchangeability test of the *du Pont* case" has been met; a "low degree of differentiation" points the other way. *United States v. Grinnell Corp.,* 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966).

The cited cases arise out of Sherman Act § 1 or Clayton Act § 7, and deal with products or services, but their rationale applies to Sherman Act § 1, and the capital market; both parties in the case at bar rely upon them as authority. The holdings in these cases illustrate the operation of the governing principle. *du Pont,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, rejected the government's contention of a market limited to cellophane, and accepted defendant's concept of a broader (and non-monopolized) "flexible packaging materials" market: "... du Pont should not be found to monopolize cellophane when that product has the competition and interchangeability with other wrappings that this record shows." 351 U.S. at 404, 76 S.Ct. at 1012. *du Pont,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057, rejected defendant's contention that the relevant market was "coextensive with the total market for finishes and fabrics," and limited the market to *automotive* finishes and fabrics because the record showed they had "sufficient peculiar characteristics and uses" to stand alone as a submarket. 353 U.S. at 593–94, 77 S.Ct. at 877–878. *Brown Shoe* held that the relevant markets were men's, women's, and children's shoes: "Those product lines are recognized by the public; each line is manufactured in separate plants; each has characteristics peculiar to itself rendering it generally noncompetitive with the others; and each is, of course, directed toward a distinct class of customers." 370 U.S. at 326, 82 S.Ct. at 1524. The Court in *Brown Shoe* rejected defendant's argument that "price/quality" and "age/sex" distinctions in shoes gave rise to further submarkets, thereby rendering the products of the company it sought to acquire noncompetitive with its own products, and avoiding a Clayton Act § 7 problem. *Grinnell* held that the "high degree of differentiation between central station protection and the other forms" of personal property protective devices justified treating the accredited central station service business as a single market. 384 U.S. at 574, 86 S.Ct. at 1705.

Application of these holdings to the case at bar poses some surface anomalies. We must visualize individual sports team investors such as Lamar Hunt (NASL Dallas Tornado and NFL Kansas City Chiefs), or a corporate investor such as Warner Communications (NASL New York Cosmos), as the economic equivalents of cellophane, finishes and fabrics, shoes, or protective systems. However, as *du Pont* teaches, the parts of commerce may vary, but "[t]he tests are constant," and the key is "reasonable interchangeability," 351 U.S. at 404, 76 S.Ct. at 1012.

Although the NASL's expert witness, Mr. Guth, referred in his direct testimony to "*potential* investors" as "the demand side of the [sports ownership capital and skill] market," affidavit at ¶ 42 (emphasis and material in brackets supplied), his testimony at trial under cross-examination narrowed the boundaries of the suggested market to "those individuals who are currently controlling owners of major professional team sports franchises." Tr. 1968. That is the "actual market"; "potential investors" fall outside its boundaries, although "to the extent that they can easily enter that activity, they represent a very important economic

factor." Tr. 1941. At one point in his testimony, Guth deprecated the value of generalizations in determining the likelihood of a potential investor entering the professional sports world: ". . . with regard to the generalizations they are useful only as kind of starting points, and then you have to evaluate each of the individuals." Tr. 1950. Notwithstanding that *caveat*, Guth shortly thereafter offered a striking generalization:

> Q. "Are persons with non-ownership experience in some other sport such as baseball or football who have or have access to adequate capital under any circumstances going to be likely investors in the analysis?
>
> A. "No. That doesn't mean that they might not make an investment, but they are certainly not likely from the standpoint of potential. As a generalization, again, if suddenly great riches fell into my lap, I might be interested in investing in a football team or baseball team or something like that, *but as a generalization, individuals with wealth today who are not currently involved in sports investments and in guiding the development of sports teams I would not say are in any sense likely investors.*" Tr. 1978 (emphasis added).

Thus, in the NASL's view, *present* sports owners comprise the *actual* sports capital and skill market, of which NFL owners form a significant part. The NASL argues that NFL's concept of a worldwide capital market for soccer, based on Caputo's analysis, bears no resemblance to the real world.

In my judgment, neither party has a monopoly on the real world. I reject the extremes of both the Guth and Caputo perceptions. Individuals and corporations alike have identifiable characteristics which incline them toward sports ownership. Findings Nos. 17–18. The absence of such characteristics, in an individual or corporation, effectively removes them from the *sports* capital market, thereby shrinking the worldwide boundaries envisioned by Caputo. But there is no basis, in logic or law, for restricting the boundaries of that submarket, as would Guth, to individuals who are presently controlling owners of a major league team. That narrow perception disregards significant, interchangeable sources of sports capital: individuals who are not presently controlling sports owners; and corporations.

As to individuals, the NASL's analysis holds water only if we assume that the present individual owners are the only people in the world with the requisite capital and interest in sports—the only people, that is, who fit the "sportsman" profile, Finding No. 17. The proposition is unrealistic on its face. Sports continue to exert their traditional fascination upon the American character, a fascination nurtured and enhanced by modern media marketing. And a startling number of individuals manage, year after year, to amass personal fortunes, despite the best efforts of the tax collectors. Sports-minded capitalists are out there. They must be. And like-minded capitalists are economically interchangeable. Capital is, indeed, fungible.

As for corporations, they have played a significant role in major sports league ownership, including that of the NASL. Finding No. 19. The NFL's by-laws prohibit corporate ownership, and the NASL makes much of that in its briefs; but the absence of corporate owners in the NFL, which prohibits them, is of no relevance to a consideration of interchangeable corporate capital for the NASL, which does not.

The NASL seeks to buttress its market concept with two assertions which, while factually accurate, do not address the basic issue. The first is that cross-ownership has frequently occurred in professional team sports. The second is that the NASL's recent efforts to attract new capital, individual or corporate, have had only limited success. The first assertion is said to demonstrate that present sports owners constitute an economically discrete submarket, based upon the likelihood of further sports investment. The second assertion is said to demonstrate the non-existence of alternative capital sources. Neither argument is persuasive.

The role of cross-owners, that is, individuals who have invested in more than one sport, is a demonstrated historical fact. But it hardly follows that, as Mr. Guth generalizes, wealthy individuals not currently involved in sports are not "in any sense likely investors" in sports. Sports investors do not spring full blown, like Topsy, upon the world's playing fields. With the exception of family members of sports team owners who succeed to control positions by death or retirement, the sports capitalist amasses his capital resources first, and then implements his sporting interest by acquiring a professional team. Sports owners come to that status by a variety of paths through life; see Finding No. 18. But the record reveals no cross-owner, past or present, individual or corporate, who was not a *non*-sports owner (and hence outside the boundaries of the NASL's suggested sports capital market) prior to his first sports investment. The boundaries of a "sports ownership capital market" must, as a matter of common sense, extend beyond present sports owners. To digress from football and soccer for a moment, I may judicially notice George Steinbrenner's purchase of the baseball New York Yankees from CBS some years ago. On the NASL's theory, Steinbrenner was outside the sports capital market until the moment when he signed the purchase contract, at which time he entered the market. In my judgment, Steinbrenner was part of the sports capital market when CBS offered the Yankees for sale. A transaction then took place which reflected the *operation* of that market. A pair of shoes is part of a products market, even if it has not yet been purchased by a consumer.

As for the NASL's difficulty in attracting new capital, that proves much about the sports capital market's evaluation of an NASL franchise under present economic conditions, but nothing about the boundaries of the market itself. The melancholy fact is that the NASL's recent history has been one of league-wide and substantial losses. Finding No. 21. By way of contrast, the NFL had no difficulty attracting briskly competing bidders when it expanded in 1974 to offer new franchises in Seattle and Tampa Bay. NFL franchises are generally profitable. The NASL invites me to infer that, because it has not succeeded in selling its franchises to individuals or corporations not currently in sports, only current sports owners constitute the sports ownership capital market. I decline to infer so narrow a market, because the more logical inference is that a considerably broader capital market has passed an adverse judgment upon the NASL as an investment, under present economic conditions. Indeed, that is a judgment shared by the NFL owners themselves; I have found that those NFL owners who declined invitations to invest in NASL franchises were substantially motivated by the view that the NASL was a poor investment. Finding No. 21.

In these circumstances, I conclude that alternative sources of sports capital exist which are reasonably interchangeable with the sources represented by present, individual sports team controlling owners. The NASL has not proved that present sports owners have such peculiar characteristics as to justify constituting them a separate and distinct economic submarket. Nor has the NASL established the boundaries of a capital submarket in which the NFL cross-ownership ban operates as a restraint upon competition.

Two additional points should be made before leaving this subject. The NASL's characterization of the "sports ownership capital and skill" market as a "factor market" does not retrieve the position. The NASL suggests in its reply brief, at p. 45, that the "factor markets for sports ownership capital and skill are appropriate for antitrust analysis" on the authority of *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). In *Mandeville*, the Court upheld the legal sufficiency of a Sherman Act complaint which alleged that beet sugar refiners had conspired to stabilize the price they paid to growers for sugar beets grown by the latter. The refiners also controlled the supply of sugar beet seed, so that the growers, to remain in the

sugar business, were required to buy seed from the refiners, as well as to sell the grown beets to the refiners at the stabilized price. Not surprisingly, the Court held that the complaint stated a cause of action in antitrust. The sugar beet, whose price was stabilized by conspiracy, was "the only raw material consumed" in the industry, 334 U.S. at 241, 68 S.Ct. at 1008; and the refiners constituted the sole source of sugar beet seeds for the growers. *Mandeville* would apply to the case at bar only if present, individual sports-controlling owners could be viewed as the sole source of sports capital, but that is clearly not the case. For comparable reasons, I suggested in the opinion on preliminary injunction that the NASL's reliance upon the "essential facility" doctrine of antitrust law was misplaced. 465 F.Supp. at 676 n.20.

Reliance is also placed on the cases dealing with teams' competition for skilled players. The differences between athletes and sources of capital funding do not require discussion.

Secondly, to the extent that the NASL argues that "the market for sports ownership capital and skill" should be read in the disjunctive, so as to create separate markets for capital and skill, I reject the argument. It is clear from the evidence that sports owners differ widely in the amount of time that they devote to their teams, and, in particular, in the degree to which they exert close personal control over operations. Finding Nos. 37, 38. Sports team owners who involve themselves directly and personally with their team's operations undoubtedly undergo learning experiences, and acquire sports entrepreneurial skills as a result; but the practice is by no means uniform. The opposite extreme was illustrated by Edward Bennett Williams, a witness called on behalf of the NASL, who is presently controlling owner of the NFL Washington Redskins, and has recently acquired the baseball Baltimore Orioles. In Williams' view, running a sports franchise is much like any commercial endeavor:

"You go get the very, very best people that you can get. You give them author-

ity, you don't interfere with them and you let them act and operate and you hold them accountable for what they do and I think that if you run a sports franchise in that way and you are able to select wise, industrious, able, prudent, honest people, that you will have success and whether you are operating one, two or three sports franchises." Tr. 1621.

Asked about areas in the operation of a professional sports franchise that are unique, as opposed to other business enterprises, Williams expressed the view that "any bright, reasonable person could assimilate those in two days." While other sports owners may hold a contrary view, and operate their franchises in a manner different from that described by Williams, there is no basis for holding that the present individual sports team owners constitute a separate market of sports "skill."

The NASL's evidence in respect of this alleged submarket comes down, in essence, only to this: there are certain present, individual sports team owners which the NASL regards as particularly *desirable*, either to retain as NASL owners, or to attract in future. Lamar Hunt and Joe Robbie certainly fall within the former category; undoubtedly other NFL owners fall within the latter category. However, the criteria for establishing the boundaries of an economic submarket are established by controlling Supreme Court authority; and the particular desires of a consumer, however sincerely or reasonably held, do not rise to that level. Another Williams wrote a play called "A Streetcar Named Desire." The NASL's concept may fairly be subtitled "A Market Named Desire." It is not a viable concept in antitrust law.

Having concluded that the NASL's suggested "sports ownership capital and skill" submarket does not exist, I need not decide whether the NASL and NFL are in actual competition with each other in the suggested area. But if competition does exist in such a submarket, it is, again, competition between two single economic entities.

█ Thus I return to the primary conclusion to which this discussion leads thus

far. Within the identifiable submarkets, the competition between the NASL and NFL which forms the subject matter of this action is in fact competition between two single economic entities uncomplicated by any relevant competition[18] between the member clubs of a league. Under the *ratii decidendi* of the professional sports league antitrust cases, no antitrust implications arise. Does higher antitrust authority in other areas of economic endeavor require a different conclusion?

### E. Non-Sports Antitrust Cases.

The NASL argues that because the NFL clubs are separate corporations, they cannot "hide behind the labels 'joint venture' and 'single economic firm,'" a ploy of antitrust defendants "which has consistently been rejected by the courts." Main post-trial brief at 137–138. The cases cited for this proposition, in addition to the sports league cases discussed *ante*, are *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), and *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

In *Timken* the government brought a civil action to restrain an alleged Sherman Act § 1 conspiracy between Timken Roller Bearing Co., an Ohio corporation, and British and French corporations in which Ohio Timken held ownership interests, to eliminate competition in the manufacture and sale of antifriction bearings in the markets of the world. Pursuant to agreements between them, these entities "(1) allocated trade territories among themselves; (2) fixed prices on products of one sold in the territory of the others; (3) cooperated to protect each other's markets and to eliminate outside competition; and (4) partici-

pated in cartels to restrict imports to, and exports from, the United States." 341 U.S. at 596, 71 S.Ct. at 973. Timken sought to excuse this classic collection of illegal activities by characterizing itself, the British and French corporations as members of a "joint venture." The Court rejected the argument:

"We cannot accept the 'joint venture' contention. That the trade restraints were merely incidental to an otherwise legitimate 'joint venture' is, to say the least, doubtful. The District Court found that the dominant purpose of the restrictive agreements into which appellant, British Timken and French Timken entered was to avoid all competition either among themselves or with others. Regardless of this, however, appellant's argument must be rejected. Our prior decisions plainly establish that agreements providing for an aggregation of trade restraints such as those existing in this case are illegal under the Act. *Kiefer-Stewart Co. v. Seagram & Sons*, 340 U.S. 211, 213 [71 S.Ct. 259, 95 L.Ed. 219]; *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223–224 [60 S.Ct. 811, 84 L.Ed. 1129] and note 59; *United States v. National Lead Co.*, [D.C.] 63 F.Supp. 513, affirmed, 332 U.S. 319; *United States v. American Tobacco Co.*, 221 U.S. 106, 180–184 [31 S.Ct. 632, 55 L.Ed. 663]; *Associated Press v. United States*, 326 U.S. 1, 15 [65 S.Ct. 1416, 89 L.Ed. 2013]. See also *United States v. Aluminum Co. of America*, [2 Cir.] 148 F.2d 416, 439–445. The fact that there is common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws. E. g., *Keifer-Stewart Co. v. Seagram & Sons*, supra [340 U.S.] at 215 [71 S.Ct. 259]. Nor do we find any

---

**18.** I stress the concept of *relevant* competition, because as the *Los Angeles Coliseum* case demonstrates, NFL member clubs may compete with each other in the same geographic submarket for a *localized* benefit: the entertainment dollars in the pockets of the sports fans in that area. Where joint action of the member clubs restrains competition between them and damages an outsider, an antitrust claim arises. That is the essence of *Coliseum I*

and *Coliseum II, supra*. But the localized interclub competition Judge Pregerson held relevant to the claim of a local stadium operator is irrelevant to competition on a nationwide scale, in the stadia or on network television, between two professional leagues. Within that context, the constituent members are at one in advancing the interests of their league's joint product, to the economic disadvantage of the product of rival leagues.

support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.' Perhaps every agreement and combination to restrain trade could be so labeled." *Id.* at 597–8, 71 S.Ct. at 974–75.

In *Perma Life*, a private antitrust action for civil damages, plaintiffs were dealers who operated "Midas Muffler Shops" under sales agreements granted by Midas, Inc. Plaintiffs claimed that Midas entered into a conspiracy with its parent corporation, International Parts Corp., two other subsidiaries, and officers or agents of these corporations to restrain or lessen competition in violation of Sherman Act § 1. That restraint arose out of provisions in the sales agreements granted by Midas to each individual dealer, which:

"... obligated the dealer to purchase all his mufflers from Midas, to honor the Midas guarantee on mufflers sold by any dealer, and to sell the mufflers at resale prices fixed by Midas and at locations specified in the agreement. The dealers were also obligated to purchase all their exhaust system parts from Midas, to carry the complete line of Midas products, and in general to refrain from dealing with any of Midas' competitors." 392 U.S. at 137, 88 S.Ct. at 1983.

The first point of decision was whether plaintiff dealers, as parties to the agreements, were *in pari delicto* with these illegal restrictions, so as to bar a claim for treble damages. The Court rejected that defense and permitted the suit, "to further the overriding public policy in favor of competition." *Id.* at 139, 88 S.Ct. at 1984. The Court then rejected the "single business entity" defense, which the Seventh Circuit had accepted:

"There remains for consideration only the Court of Appeals' alternative holding that the Sherman Act claim should be dismissed because respondents were all part of a single business entity and were therefore entitled to cooperate without

creating an illegal conspiracy. But since respondents Midas and International availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities. See *Timken Co. v. United States*, 341 U.S. 593, 598 [71 S.Ct. 971, 95 L.Ed. 1199] (1951); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227 [67 S.Ct. 1560, 91 L.Ed. 2010] (1947). In any event each petitioner can clearly charge a combination between Midas and himself, as of the day he unwillingly complied with the restrictive franchise agreements, *Albrecht v. Herald Co.*, 390 U.S. 145, 150 [88 S.Ct. 869, 19 L.Ed.2d 998] n.6 (1968); *Simpson v. Union Oil Co.* [377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98] supra, or between Midas and other franchise dealers, whose acquiescence in Midas' firmly enforced restraints was induced by 'the communicated danger of termination,' *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 372 [87 S.Ct. 1856, 18 L.Ed.2d 1249] (1967); *United States v. Parke, Davis & Co.*, 362 U.S. 29 [80 S.Ct. 503, 4 L.Ed.2d 505] (1960)." *Id.* at 141–2, 88 S.Ct. at 1986.

*Timken* and *Perma Life* unquestionably hold that "joint venture" or "single economic entity" concepts could not justify the anticompetitive conduct of those particular defendants. But these cases do not require rejection of the concept in the case at bar. That is because of the unique nature of a professional sports league and its product, repeatedly recognized by the courts albeit in different contexts. Single companies can, and do, make bearings and mufflers. No interdependence or joint action is necessary to make a bearing or a muffler. Companies manufacturing such articles are horizontal competitors in their respective markets. *Timken* and *Perma Life* hold that companies cannot conspire or combine to restrain such competition, even if common ownership or other intercorporate relationships might otherwise support the label "joint venture" or "single economic entity."

The professional sports league is entirely different. The individual teams cannot, and do not, make the league product. Interdependence and concerted activity are essential to the existence of that product: major league soccer, football, and the others. *Timken* and *Perma Life* are inapposite because, in those cases, the concerted activity condemned under the Sherman Act did not create the product; rather, it restrained competition in the sale of a product which depended not a whit upon joint action for its existence. Thus in *Timken* the Court doubted the legitimacy of the proclaimed joint venture because its "dominant purpose" "was to avoid all competition either among themselves or with others." 341 U.S. at 597–8, 71 S.Ct. at 974–75. The "dominant purpose" of sports league members' agreements among themselves is to make league sport possible. Similarly, *Perma Life*, citing *Timken*, says of the interrelated Midas corporate defendants that "the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities." 392 U.S. at 141–2, 88 S.Ct. at 1986. True enough: but the unique nature of a professional sports league lies in the fact that "separate entities" cannot produce its product.

I conclude that bearings and mufflers are so different from footballs and soccer balls that the NASL's argument, in effect, compares apples with oranges. *Timken* and *Perma Life* do not foreclose the NFL's single economic entity concept.

These considerations also serve to distinguish *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). In the prior decision on preliminary injunction, I rejected on the papers then before me the NASL's contention of *per se* illegality and, following the sports league cases discussed

*ante*, opted for the rule of reason as the standard by which the NFL's cross-ownership ban should be judged. 465 F.Supp. at 672–5. The rule of reason as articulated in *Professional Engineers* requires consideration of "whether the challenged agreement is one that promotes competition or one that suppresses competition." 435 U.S. at 691, 98 S.Ct. at 1365. In point of fact, the Court in *Professional Engineers* condemned as *per se* illegal an engineering society's canon of ethics prohibiting its members from submitting competitive bids for engineering services. Those services are rendered on an individual basis. Joint or concerted action is not necessary to make them available to the public. *Professional Engineers* does not foreclose the NFL's single economic entity defense, where concerted activity is necessary to create the product *ab initio*,[19] and the competition between sports leagues in the identifiable markets does not involve any competition between the constituent members of the leagues.[20]

The parties discuss in their briefs the Supreme Court's more recent decision in *Broadcast Music, Inc. v. Columbia Broadcasting System, supra*. The case is interesting, but does not bear particularly closely on the one at bar. The relevant market was the licensing to television networks of performing rights to copyrighted musical compositions. CBS challenged the legality of blanket licenses issued to the networks at negotiated fees by ASCAP and BMI, organizations which represent individual composers to negotiate with and license users of copyrighted works, and detect unauthorized use. The Court, reversing the Second Circuit, held that the blanket license was not a *per se*, price-fixing violation of Sherman Act § 1, and remanded for further proceedings, including an assessment of the blanket license under the rule of reason. In point

**19.** Cf. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1978):

"Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all."

**20.** Cf. *Smith v. Pro-Football, Inc., supra*, where the court of appeals was guided by the rule of reason as articulated in *Professional Engineers* in evaluating the legality of the NFL player selection system's restraints upon competition between the member teams for players. 593 F.2d at 1175 n.3, 1183 n.43.

of fact, the Second Circuit on remand, 620 F.2d 930 (2d Cir. 1980), did not feel required to make a rule of reason analysis, since it affirmed District Judge Lasker's conclusion following trial, 400 F.Supp. 737 (S.D.N.Y. 1975), that CBS failed to prove the blanket license restrained competition at all.

To the extent that *Broadcast Music* furnishes guidance on the question of the NFL's status as a single (and therefore non-conspiring) economic entity, it derives from the Court's flexible approach. Rejecting the *per se* rule, Justice White wrote that "easy labels do not always supply ready answers." 441 U.S. at 8, 99 S.Ct. at 1556. A comparable observation appears in *Smith v. Pro-Football, Inc., supra,* at 1182: "In antitrust law, as elsewhere, we must heed Justice Cardozo's warning to beware 'the tyranny of tags and tickets,'" quoting Cardozo, *Mr. Justice Holmes,* 44 Harv.L. Rev. 682, 688 (1931). The Court in *Broadcast Music* quoted with evident approval the statement of the Justice Department, in a prior ASCAP case, that "[t]he Sherman Act has always been discriminatingly applied in the light of economic realities." *Id.* at 14. An example is found in the Court's observation, quoted at n.19 *supra,* that joint ventures are not usually regarded as unlawful price-fixing schemes "where the agreement on price is necessary to market the product at all." The *Broadcast Music* Court, conceding that "[w]e have never examined a practice like this one before," *id.,* 441 U.S. at 10, 99 S.Ct. at 1557, gives a perceptive analysis of the blanket license:

> "This substantial lowering of costs, which is of course potentially beneficial to both sellers and buyers, differentiates the blanket license from individual use licenses. The blanket license is composed of the individual compositions plus the aggregating service. *Here, the whole is truly greater than the sum of its parts; it is, to some extent, a different product.* The blanket license has certain unique characteristics: It allows the licensee immediate use of covered compositions, without the delay of prior individual negotiations, and great flexibility in the choice of musical material. Many con-

sumers clearly prefer the characteristics and cost advantages of this marketable package, and even small performing-rights societies that have occasionally arisen to compete with ASCAP and BMI have offered blanket licenses. *Thus, to the extent the blanket license is a different product, ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material.* ASCAP, in short, made a market in which individual composers are inherently unable to compete fully effectively." *Id.* at 21–2 [99 S.Ct. at 1563–64]. (emphasis added; footnotes omitted).

In my judgment, the NFL's single economic entity concept finds some support in the Court's recognition that joint activity, inherently necessary to produce a marketable and recognizably different product, creates a single, "separate seller" of that product (the blanket license), notwithstanding the fact that the efforts of many individuals comprise the product. The blanket license in *Broadcast Music* may fairly be analogized to a professional sports league, whose product (NASL soccer, NFL football) is indeed, in the light of practical economic realities, "greater than the sum of its parts."

The Second Circuit, on remand in *Broadcast Music,* concluded that the networks could feasibly enter into direct licensing from individual composers. Therefore the alternative product of the blanket license, purchased by the networks solely because of convenience and preference, was not a *restraint* of trade; and the rule of reason had no office to perform. In the case at bar, no alternative product exists. Richard Rodgers could compose, play, and license his own songs; but a professional sports team cannot play or market itself. The sports league's product can exist only as the result of joint effort. In that context, I conclude that there is no *combination* in restraint of trade; and so the rule of reason has no office to perform.

## F. *Disposition of the NASL's Claims.*

On this analysis, we may recognize both the anticompetitive intent and effect of the NFL cross-ownership ban, and still find ourselves navigating outside Sherman Act waters. In the opinion on preliminary injunction, 465 F.Supp. at 677, I said:

"It is difficult for defendants to deny any anticompetitive intent for the cross-ownership ban, in the face of Commissioner Rozelle's explanatory statement of June 28, 1978 to the NFL owners, which included the following discussion as a reason for the ban:

'The NFL's success depends on fan interest and loyalty. The League competes with other major team sports for that interest and loyalty, as well as for gate receipts, television revenues, advertising dollars, and media coverage. Connections with NFL personnel may well enhance these competing team sports, both in fact and in the public's perception, at the expense of the NFL.'"

The NASL characterizes Rozelle's statement as a "smoking pistol." The difficulty is that in economic competition, not all firearms are illegal. The Sherman Act is concerned with the Gatling gun effect of several independent barrels, bound and firing together to restrain trade; or, at the very least, a double-barrelled shotgun. The single-barrelled pistol is not the happiest analogy for the Sherman Act plaintiff.

The anticompetitive intent of the cross-ownership ban is not an illegal intent, because the NFL, which competes against other professional sports leagues as a simple economic entity, seeks to promulgate the ban in furtherance of that entity's marketplace efficiency. The ban is an exercise in entity housekeeping; and as a matter of economic reality, it is a one family, fully detached house. I need not further mix the metaphors. I have found that the cross-ownership ban has a conceded anticompetitive intent, and, in its impact on the NASL,

will probably have an anticompetitive effect. I conclude that, in the circumstances of the case, neither intent nor effect falls within the Sherman Act.

While this case, in its application of Sherman Act principles to competition between professional sports leagues, is one of first impression, the conclusion I have reached is supported, at least to my mind, by common sense. Trial judges customarily instruct jurors to take their common sense with them into the jury room. The judge, as fact finder in chambers, may usefully follow that advice.

Professional sports leagues compete with each other. The members of one league, who sustain and support that entity, wish to exclude from their ranks individuals who, directly or through their families, sustain and support a competing league. A man of reasonable common sense, unschooled in antitrust law, would have difficulty understanding why they could not do so. It is not necessary to resort to Dickensian invective [21] to conclude that the law does not require what common sense would surely condemn. To hold otherwise would be to disregard the Second Circuit's recent warning: "We must always be mindful lest the Sherman Act be invoked perversely in favor of those who seek protection against the rigors of competition." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273 (2d Cir. 1979), per Kaufman, Ch.J., *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). No Sherman Act violation appears in this case.

Having held that the NFL's acts do not implicate the Sherman Act, no question arises under the rule of reason. If an appellate court should take a different view, that issue may be addressed on remand, on the present record, as well as plaintiffs' claims for damages. No present opinion as to those questions is intimated.

Plaintiffs' claims under the Clayton Act will accordingly be dismissed.

---

**21.** "If the law supposes that," said Mr. Bumble ... "the law is a ass, a idiot." *Oliver Twist*, ch. 51.

### G. The NFL's Counterclaims.

The NFL has pleaded, and urged at trial, two counterclaims against the NASL and its member teams. They are pleaded in the alternative. Both seek injunctive relief.

The first counterclaim,[22] consistent with the NFL's perception of professional sports leagues as single economic entities, views the presently existing cross-ownership as in the nature of interlocking directorates, illegal under a theory analogous to the Clayton Act, § 8 prohibition against corporate interlocking directorates, 15 U.S.C. § 19. The NFL prays for a permanent injunction against the NASL and its member clubs, "barring simultaneous ownership by any individual, group of individuals or business entity of a controlling interest in both an NASL club and an NFL club." NFL Proposed Order, ¶ B.

Alternatively, the NFL adopts the NASL's view of the league as a collection of competing team owners. The NFL alleges by way of counterclaim that the member clubs and the league commissioner have conspired "to raise, maintain and stabilize NASL franchise prices," NFL Proposed Conclusion of Law 174, which should be enjoined.

■ Neither counterclaim has substance. As to the first counterclaim, assuming *arguendo* that the NFL and NASL cross-owners should be analogized to Clayton Act § 8 interlocking directors, the NFL is entitled to injunctive relief only if it makes the requisite showing of "threatened loss or damage" under § 16, 15 U.S.C. § 26. A party seeking Clayton Act § 16 injunctive relief must demonstrate "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969). The holding in *Zenith Radio* has been interpreted as teaching "that not only must there be a threat of injury, but that the threat must be signifi-

cant for injunctive relief to be granted." *Coliseum I, supra*, at 468 F.Supp. 159. There is no evidence in the record from which I could find that NFL is facing a significant threat of injury from a cross-ownership ban which it has tolerated for many years.

■ Even if such a significant threat were demonstrated, the NFL does not require the intervention of a court of equity to remedy the situation. Precisely because the two competing leagues should be regarded as single economic entities, as the NFL has contended and the Court has held, a complete remedy lies within the NFL's own hands. Passage and enforcement of the NFL's cross-ownership ban is clearly sufficient to remedy whatever threat the NFL perceives in cross-ownership. An injunction would be mere surplusage. Courts of equity do not expend their energies in unnecessary exercises.

■ The Clayton Act § 16 injunctive relief sought by the alternative counterclaim also fails for lack of proof of any actual or threatened damage. The NASL are charged with conspiring to inflate or stabilize the price of NASL franchises. But there is no evidence whatsoever that any of the NFL defendants had any interest in acquiring an NASL franchise, and suffered damages in consequence. On the contrary: the NFL adduced at trial considerable evidence for the proposition that the last thing an NFL owner wants is an NASL franchise.

The counterclaims will be dismissed on the merits.

### H. Claims for Attorneys' Fees.

Both sides claim attorneys' fees. The claims are denied.

■ "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Exceptions to that rule may be created by statute; or, in

---

**22.** The manner in which the NFL's counterclaims were pleaded in the answer was amended at trial to conform to their presentation in the pre-trial order and brief. Tr. 44–48.

the absence of statutory prohibition, by exercise of the court's inherent equitable powers, if particular circumstances appear. Those circumstances, summarized in *Alyeska* at 257–259, 95 S.Ct. at 1621–22, include the recovery of attorneys' fees incurred by a party whose suit creates a fund for the benefit of others; fees generated by the willful disobedience of a court order, as part of the fine to be levied upon the defendant; or when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," citing *F. D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974).

In antitrust law, § 4 of the Clayton Act, 15 U.S.C. § 15, provides that a person "injured in his business or property by reason of anything forbidden in the antitrust laws" may sue and recover treble damages, "including a reasonable attorney's fee." Section 16 of the Clayton Act, 15 U.S.C. § 26, was amended in 1976 so as to provide that in an action brought under the antitrust laws for injunctive relief, the court shall award a reasonable attorney's fee, as part of costs, in any action "in which the plaintiff substantially prevails . . . "

▮ The typical claim for attorneys' fees in an antitrust case is made by a successful plaintiff; however, an award will lie in favor of a defendant who successfully prosecutes a counterclaim sounding in antitrust. *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873 (7th Cir. 1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). A successful antitrust defendant may also tax a statutory bill of costs, as the prevailing party under Rule 54(d), F.R. Civ.P. *In re Nissan Antitrust Litigation*, 577 F.2d 910, 918 (5th Cir. 1978).

▮ The pertinent provisions of the antitrust laws require success on an affirmative claim, as a condition precedent to the award of attorneys' fees. The defendant, even if successful in resisting plaintiffs' claim, has no such entitlement. The Third Circuit held in *Byram Concretanks, Inc. v. Warren Concrete Products Co.*, 374 F.2d 649, 651 (3rd Cir. 1967), that "in the absence of specific legislative authorization attorneys' fees may not be awarded to defendants in private antitrust litigation," a holding cited by the Supreme Court with apparent approval in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 419 n.13, 98 S.Ct. 694, 699, n.13, 54 L.Ed.2d 648 (1978).

In the case at bar, the plaintiffs' antitrust claims will be dismissed, as will the defendants' counterclaims. In these circumstances, there is no statutory entitlement to attorneys' fees.

▮ While at least one court has suggested that an equitable claim for attorneys' fees would lie in favor of a successful antitrust defendant, *Juneau Square Corp. v. First Wisconsin National Bank of Milwaukee*, 435 F.Supp. 1307, 1327 (E.D.Wis.1977), none of the circumstances summarized in *Alyeska, supra*, is present here. I have rejected the claims and counterclaims on their merits, but it cannot be said that any of the claims were asserted or prosecuted in bad faith.

In these circumstances, attorneys' fees will not be awarded to any party. Nor will costs be awarded, the plaintiffs' claims and the defendants' counterclaims all having been rejected on their merits. *Srybnik v. Epstein*, 230 F.2d 683, 686 (2d Cir. 1956).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter of this action.

2. Plaintiffs have failed to prove that defendants conspired to restrain trade in any identifiable market of trade or commerce, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

3. The acts of the defendants revealed by the evidence are the acts of a single economic entity, and as such fall outside the boundaries of the antitrust laws.

4. Therefore the NFL cross-ownership ban cannot be regarded as a group boycott, illegal *per se*; and no occasion arises for evaluation of the ban under the rule of reason.

5. The defendants' counterclaims are without merit.

## CONCLUSION

Judgment will be entered dissolving the preliminary injunction, and dismissing the complaint and counterclaims with prejudice, the parties to bear their own costs and attorneys' fees.

Since the by-law proposed in 1978 allowed for time for NFL owners to divest themselves of other sports interest before the sanctions for non-compliance came into effect, the judgment vacating the preliminary injunction will provide that any NFL by-law or constitutional amendment implementing a cross-ownership ban must include a time for compliance, from the effective date of the amendment, at least as long as the period contemplated in the October, 1978 proposal.

In view of the importance of the legal issues raised, and the adverse effect upon plaintiffs if defendants were now to promulgate a cross-ownership ban, the judgment dissolving the preliminary injunction will be stayed, and the injunction continued, pending appeal, if any. F.R.Civ.P. 62(c).

Settle judgment on ten (10) days' notice.